## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| PATTY L. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | 4:09CV3164 |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Patty L. Smith (Smith) filed an application for disability benefits under the Social Security Act (Act), 42 U.S.C. §§ 401, *et seq.*, and supplemental security income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*, on December 30, 2004. The Social Security Administration (SSA) denied benefits initially and on reconsideration. On June 13, 2008, an administrative law judge (ALJ) held a hearing and, on July 22, 2008, determined Smith was not disabled under the Act. The Appeals Council denied Smith's request for review on May 27, 2009. Smith now seeks judicial review of the ALJ's determination as it represents the final decision of the Commissioner of the Social Security Administration.[1] Smith filed a brief (Filing No. 17) and a reply brief (Filing No. 21) in support of this administrative appeal. The Commissioner filed the administrative record (AR.) and a brief (Filing No. 20) in opposition to Smith's appeal for benefits.

Smith appeals the ALJ's decision and asks that the case be reversed and benefits awarded or remanded for two reasons: (1) the ALJ failed to find Smith's bipolar disorder was a severe impairment under the Social Security regulations and rulings and (2) the ALJ committed error by relying on an improper hypothetical question when examining the Vocational Expert (VE). **See** Filing No. 17 - Brief p. 11. This court has jurisdiction to review the final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). The court has reviewed the record, the ALJ's decision and findings, the parties' briefs, the hearing transcript, and applicable law, and finds the ALJ's

---

[1] The parties consented to jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. **See** Filing No. 14.

ruling that Smith is not disabled is supported by substantial evidence in the record and should be affirmed.

## PROCEDURAL BACKGROUND

Smith applied for SSI and disability insurance benefits on December 30, 2004, pursuant to the Act (AR. 42-44, 480-485). Smith alleged an inability to engage in any substantial and gainful work activity after April 1, 2004, due to knee pain and bipolar disorder (AR. 39, 42-44, 52, 91, 480-485). The SSA denied benefits initially and on reconsideration (AR. 13, 486, 492). Thereafter, on June 13, 2008, ALJ James P. Berry held a hearing (AR. 13-19, 502). On July 22, 2008, the ALJ determined Smith was not disabled within the meaning of the Act, specifically sections 216(i), 223(d) and 1614(a)(3)(A), from April 1, 2004, through the date of the decision and thus was not eligible for benefits under the Act (AR. 13).

## FACTUAL BACKGROUND

### A.    Administrative Hearing

At the administrative hearing on June 13, 2008, Smith testified she was 51 years old and had not worked since April 1, 2004 (AR. 504). Prior to that time, Smith worked for eleven years at an insurance company (AR. 504). As part of her employment, Smith answered phones and set up appointments for insurance agents (AR. 504). Previously, Smith had been employed by U.S. Central Corporation, where she typed medical appointments (AR. 504). Smith graduated from high school (AR. 504). Smith testified she has severe arthritis in both of her knees and underwent knee replacement surgery in May 2004, and in January 2005 (AR. 505). Smith testified her knee condition restricts her daily activities by causing her pain and by restricting her walking and climbing (AR. 505). Smith's knee pain is controlled with Tylenol (AR. 505).

Smith testified bipolar disorder affects her daily activities due to mood swings lasting four to five hours (AR. 506). Smith stated she has more depressive periods than manic periods (AR. 506). Smith used to clean her house, but does not care to clean anymore (AR. 506). When suffering a depressive period, Smith lays on the couch and does nothing (AR. 506). Stress triggers the disorder and causes Smith to become angry and easily

2

confused (AR. 506).  Smith suffers problems with her memory and completing tasks (AR. 507).  Smith's husband helps by cooking and cleaning (AR. 507).  Smith sees a therapist[2] every two to three weeks and takes medication for her condition (AR. 507).  Smith testified the medications she takes are helpful, but she did not think she would be able to do the job she did before (AR. 512-513).  Specifically, Smith stated her knees bother her too much to work and she would not be able to concentrate or stay focused on her work (AR. 513).

Smith testified she can be on her feet for about two hours and sit for about two hours at a time, once in the course of a work-day (AR. 508).  Smith said she could carry fifteen to twenty pounds (AR. 508).  Smith can walk up stairs if there is a railing, but cannot crouch or kneel (AR. 508).  Smith testified she does not have trouble sleeping at night, but she spends most of her time during the day asleep (AR. 508).  Smith washes dishes occasionally, but becomes dizzy when shopping (AR. 509).  Smith has a driver's license, but no longer drives (AR. 509).  Smith explained she went to Goodwill for vocational rehabilitation and also went for stress classes five times a week for about a year in 2006 (AR. 509-510).  Contrary to notations in the medical records, Smith testified that she never used methamphetamine or other illegal drugs (AR. 511-512; **compare** AR. 323-324 "The patient has also reported a history of using methamphetamine in the 1970s" and was selling and abusing marijuana resulting in felony convictions as an adolescent.).

The VE, Cheryl R. Chandler, a certified rehabilitation counselor, also testified at the hearing (AR. 513).  The VE described Smith's previous work as a receptionist/appointment clerk as semi-skilled, Specific Vocational Preparation (SVP) four, and sedentary (AR. 514).  The ALJ posed hypothetical questions to the VE that included an individual of Smith's age and education who could lift and carry up to ten pounds frequently, who could stand and walk two hours and sit six hours, who could occasionally climb ramps and stairs, occasionally crouch, balance, and stoop (AR. 514).  The individual could not climb ropes, ladders or scaffolds, kneel, or crawl (AR. 514).  The individual would have to avoid exposure to extreme cold, vibration, unprotected heights, and dangerous moving

---

[2] Smith testified her therapist is Martin Ellison, whom she has seen for three years (AR. 507), however there exists only a therapist's statement from Mark D. Nelson in the record (AR. 474-479).

3

machinery (AR. 514).   Based on these restrictions, the VE testified such an individual would be capable of performing Smith's past relevant work (AR. 514).   In a second hypothetical, the ALJ added the restrictions that the individual could only stand and walk for two hours total, sit for two hours total, lift fifteen to twenty pounds, but could not tolerate stress, would become easily confused, and could not kneel or crouch (AR. 514-515).   With these added restrictions, the VE gave the opinion the individual could not perform Smith's previous work (AR. 515).   Smith's counsel then asked the VE to assume the individual in the hypothetical was limited as described in the statement made by Alan Baumgardner (Baumgardner), a certified physician assistant (PA-C), for example, that the individual had poor or no useful abilities to function based on psychological symptoms related to memory and understanding (AR. 515-516 (**citing** Ex. 13F, which is AR. 468-473)).   Again the VE gave the opinion the individual could not perform Smith's previous work (AR. 516).

## B.    Medical Records

On May 11, 2004, Smith presented to Saint Francis Medical Center (Saint Francis) in Grand Island, Nebraska, for a left total knee arthroplasty (AR. 147).   Smith's preoperative diagnosis was osteoarthritis of the left knee (AR. 147).   Prior to the surgery, Smith visited Douglas J. Herbek, M.D. (Dr. Herbek), for a general health preoperative physical examination, at which time he opined Smith's depression was "well controlled on Zoloft" (AR. 265).   After the surgery Smith was in stable condition (AR. 148).   On December 28, 2004, Smith visited Dr. Herbek, for a preoperative physical examination with respect to Smith's right knee (AR. 257).   Dr. Herbek wrote Smith's depression was "currently well controlled on Zoloft" and Smith's pain in her right knee was secondary to Smith's osteoarthritis (AR. 257).   On January 4, 2005, Smith again presented to Saint Francis, this time for a right total knee arthroplasty (AR. 122).   Smith was in stable condition after the surgery (AR. 123).

On July 7, 2005, Linda Schmechel, Ph.D. (Dr. Schmechel), a state reviewing psychologist, completed a Psychiatric Review Technique form (PRT) (AR. 228-241).   Dr. Schmechel found Smith has an affective disorder that is non-severe (AR. 228).   In the PRT, Dr. Schmechel stated Smith did not have any limitations in activities of daily living or maintaining social functioning (AR. 238).   Dr. Schmechel determined Smith had a mild

4

limitation in maintaining concentration, persistence, or pace, but did not have any episodes of decompensation of extended duration (AR. 238).  Dr. Schmechel relied on Smith's "family doctor" who indicated Smith's "depression is well controlled and not a problem currently" (AR. 240).  Dr. Schmechel concluded Smith's condition was considered non-severe (AR. 240).  On July 8, 2005, a state agency medical consultant completed a Physical Residual Functional Capacity Assessment (AR. 242-249).  The medical consultant concluded that Smith made a good recovery after her knee replacements with no complications, but is limited to sedentary work (AR. 247).

On August 8, 2005, Smith passed out at Saint Francis while she was standing next to her grandson's bed (AR. 458).  Smith hit her forehead and the bridge of her nose on the bed and lost consciousness for five to ten seconds (AR. 458).  Saint Francis' report stated Smith had vasovagal syncope, probably in reaction to seeing a fishhook in her grandson's finger (AR. 459).  A doctor discharged Smith, who felt back to normal and was stable during the exam (AR. 459-460).  The doctor prescribed medications for knee pain, but noted Smith was well-nourished with appropriate mood and affect (AR. 458-459).

On October 4, 2005, Smith visited Baumgardner, PA-C, at Mid-Plains Center for an initial psychiatric evaluation (AR. 322-326).  According to Baumgardner's therapy notes, Smith's primary complaints were "depression" and "increased stress" (AR. 322).  During the evaluation, Smith stated she was having problems with anxiety due to her daughter and three grandchildren moving into Smith's home (AR. 322).  Smith reported a sensation of being on edge, driving too fast, and yelling (AR. 322).  Smith described her behaviors as similar to what she had when her daughter was a child (AR. 322).  Smith also stated her husband was an alcoholic and she had financial difficulties (AR. 322).  Smith reported that when she ran out of medication, she felt as if she would lose her mind, but improved on medication (AR. 322).  Smith visited friends and watched television for fun (AR. 323).  Her grooming was satisfactory and her mood was angry, yet cooperative (AR. 325).

Baumgardner assigned Smith a global assessment of functioning (GAF) score of 45[3] and described Smith's prognosis as fair (AR. 326).

On October 13, 2005, Smith reported increased sleep and anger issues (AR. 320). Baumgardner noted Smith had depression and agitation which were not controlled on Zoloft (AR. 320). Smith also reported filing for bankruptcy and that her hot water tank had broken (AR. 320). Smith agreed to continue taking Zoloft, while Lamictal and Abilify were added (AR. 321). On October 31, 2005, Smith reported increased sadness and crying, with no improvement on the medication (AR. 318). Baumgardner described Smith's affect as flat and restrictive although she was logical, goal-oriented, pleasant, and cooperative (AR. 318). Baumgardner altered Smith's medications with a plan to discontinue Zoloft (AR. 319). On November 15, 2005, Smith reported increased crying and developing a rash since discontinuing Zoloft (AR. 316). Smith stated that previously while on Zoloft, she had felt better but periodically angry (AR. 316). Baumgardner discontinued Smith's Lamictal, decreased her dosage of Abilify, and increased her dosages of Seroquel and Risperdal (AR. 317). On December 2, 2005, Smith reported no rash, better sleep, improvement with anger problems, and no feelings of sadness in the last week (AR. 314). Baumgardner noted Smith's affect was mildly restrictive, but her thought content was logical and goal-oriented (AR. 314). Some of Smith's medications had run out and she was given sample packages of Seroquel and Risperdal (AR. 314-315).

On January 6, 2006, Smith reported her mood was "very stable," with only mild depression (AR. 312). Smith denied any angry outbursts or mood instability and any feelings of hopelessness or helplessness and felt only "slight sadness" (AR. 312). Smith stated she felt her medication, started in November 2005, was "working well" (AR. 312). On January 31, 2006, Smith stated she was spending time at Goodwill Day Treatment Center (Goodwill) three times a week (AR. 310). Smith reported knee pain, but no sadness

---

[3] The Global Assessment of Functioning (GAF) is a clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. **See** American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders, 30-32 (4th ed. text rev. 2000) (DSM-IV-TR). A GAF of 41 through 50 is characterized by serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). **See** DSM-IV-TR at 34.

and her depression was "okay" (AR. 310).  Baumgardner noted Smith was pleasant, cooperative, and taking her medications as prescribed (AR. 310).

On February 15, 2006, Smith stated improvement with anger but some mild irritation with her grandchildren (AR 308).  Smith reported problems with confusion and her affect was mildly confused (AR. 308).  Baumgardner noted that Smith's thought content was clouded (AR. 308).  On February 20, 2006, Smith stated she was not able to sleep and took one to two tablets of Seroquel without improvement (AR. 306).  Baumgardner noted Smith was confused, unable to make sense of direction, and reported missing an appointment at Goodwill (AR. 306).  Baumgardner noted Smith's affect was mildly irritable and questioned whether she was taking medications as prescribed (AR. 306).  Smith's Risperdal was increased (AR. 306).  On February 27, 2006, Smith reported the inability to fall asleep and stay asleep (AR. 304).  Baumgardner noted Smith's medication had helped her with anger and sadness (AR. 304).  Baumgardner noted Smith's affect was flat and mildly restrictive, but she was alert, oriented, friendly, cooperative, and activities of daily living, or "ADL['s,] were satisfactory" (AR. 304).  On March 13, 2006, Smith reported after going to Goodwill every day, she would lay down and take a three hour nap (AR. 302).  Smith reported doing household tasks herself and having no side effects or breakthrough symptoms (AR. 302).

On April 10, 2006, Smith reported she was sleeping too much, all night and half the day, had increased depression and irritability, and expressed a desire to have an antidepressant (AR. 300).  Smith blamed her sleep patterns on her grandchildren and husband (AR. 300).  Baumgardner noted Smith was alert, oriented, and her affect was more euthymic and mildly irritable (AR. 300).  Baumgardner altered Smith's medications (AR. 301).  On April 24, 2006, Smith reported she had no major concerns (AR. 298).  Smith reported she occasionally babysat her two grandchildren ages two years and eighteen months (AR. 298).  Baumgardner noted Smith's thought process was logical and goal-oriented, she was friendly, cooperative, taking her medications as prescribed and her "ADL's were satisfactory" (AR. 298).

On July 31, 2006, Smith reported she had noticed some increased depression related to financial difficulties and her husband's alcohol abuse (AR. 294).  Smith felt she was slipping back into mental illness due to sleep disturbance, increased irritability, yelling,

screaming, and throwing things (AR. 294). Smith was out of some of her medications (AR. 294). Smith's affect was mildly restricted and her thought process was logical and goal-oriented (AR. 294). Baumgardner opined Smith was stabilizing on current medications and gave her sample packages of Cymbalta and Risperdal (AR. 295).

On September 12, 2006, Smith stated that she felt better since her last visit (AR. 290). Smith also reported no problems with depression or agitation and had satisfactory ADL's (AR. 290). On October 9, 2006, Smith reported she was concerned because she continued to lose weight even though she was eating (AR. 292). Smith also reported visiting the Emergency Room after becoming dizzy and fainting (AR. 292). Baumgardner noted Smith's affect was mildly restricted and her thought process was logical and oriented (AR. 292). Smith had no acute distress and was taking her medication as prescribed (AR. 292). On November 20, 2006, Smith reported she was having less problems with losing weight and depression (AR. 288). Baumgardner noted Smith had a mildly restricted affect, was pleasant, cooperative, oriented, goal-directed, and in no acute distress (AR. 288). However, Smith had not taken her medication as prescribed and did not follow through with appointments with her doctor or health clinic (AR. 288).

On January 17, 2007, Smith reported she had increased agitation and irritability and had been out of her medications for two weeks (AR. 286). Baumgardner noted Smith's affect was restricted but she was in no acute distress (AR. 286). On March 12, 2007, Smith reported no depression, but some irritability related to having two three-year-olds and two one-year-olds in her house (AR. 284). Baumgardner noted her affect continued to be restricted and she had poverty of speech, but she was in no acute distress and was pleasant and cooperative (AR. 284). Baumgardner told Smith to return in four months, unless she experienced increased problems (AR. 285). Baumgardner wrote a letter on Smith's behalf stating that Smith was "unemployable at this time" (AR. 285). Baumgardner did not indicate to whom the letter was written.

On May 7, 2007, Smith complained of passing out, but stated she could feel it coming on in time to sit down (AR. 282). Smith admitted she was not eating or drinking enough liquids for her medication (AR. 282). Baumgardner planned to discontinue the problematic medication, Cymbalta (AR. 283). Baumgardner noted Smith's thought process was logical and goal-oriented with a mildly restricted affect (AR. 282). On June 11, 2007,

Smith reported she could not stop taking Cymbalta due to increased problems (AR. 280). Baumgardner noted Smith's affect was mildly restricted, but she was pleasant, cooperative, and in no acute distress (AR. 280). Baumgardner restarted Smith's Cymbalta (AR. 281). On July 13, 2007, Smith reported some minor problems with depression, but no anger or irritation (AR. 278). Smith reported spending time during the day watching her daughter's two children, so she declined to attend Goodwill sessions three times a week (AR. 278-279). Baumgardner noted Smith's affect was euthymic, but restricted (AR. 278). Baumgardner questioned whether Smith was taking her medication as directed and wrote that her ADL's could improve, as she was malodorous (AR. 278). However, Baumgardner noted Smith was pleasant, alert, and in no acute distress (AR. 278). Baumgardner wrote a note for Health and Human Services, stating Smith was evaluated and not found fit for employment, but would be re-evaluated in three months (AR. 279). Baumgardner noted Smith missed her July 30, 2007, appointment for her medication by injection (AR. 279).

On August 14, 2007, Baumgardner noted Smith was "brighter than at last visit" and taking medication as directed, but stated "ADL's could improve, malodorous and unkempt hair" (AR. 276). On August 28, 2007, Baumgardner found Smith's affect "more bright this visit" although she "remained mildly restrictive and mildly confused," noted "ADL's were poor, malodorous" and discovered an intact band-aid at the injection site, stating it was "from one month ago, intact" (AR. 274).[4] In November 2007 Smith again appeared to have "better interaction," but Baumgardner prescribed a seizure medication, Depakote, due to Smith's emergency room visit for dizziness (AR. 272-273). Upon advice during her emergency room visit, Smith discontinued use of any psychotropic medications (AR. 272).

On January 14, 2008, Smith reported she was sleeping too much and experiencing high levels of depression and anger (AR. 270). Smith had a change of speech, which caused her to slur her words, and her affect was mildly irritable (AR. 270). Baumgardner again observed "ADL's could improve. The patient was malodorous" (AR. 270). Baumgardner noted Smith was taking her medications as directed and added Effexor (AR. 271). On February 26, 2008, Smith reported an improvement with medication and her

---

[4] Contrary to the office notes, the record indicates Smith received an injection on August 14, 2007, but missed her previous appointment for an injection on July 30, 2007 (AR. 279, 276).

daughter and grandchildren had moved out of her house (AR. 269). Smith stated she had more energy and desire to do things, including household tasks (AR. 269). Smith reported she "often" went out to dinner with her friends and daughter (AR. 269). Baumgardner observed Smith's thought process was logical and goal-directed and her "ADL's were mildly improved" (AR. 269). On May 13, 2008, Smith reported no feelings of worthlessness or hopelessness, but she reported feelings of helplessness and that she cried "all the time" (AR. 493). Smith stated her family did not take her out enough; however, Smith would walk around in the summer months to visit neighbors and talk with friends on the telephone (AR. 493). Baumgardner observed Smith was pleasant, cooperative, goal-oriented, taking her medication as directed, and had a euthymic affect, but her "ADL's could improve" (AR. 493). Baumgardner found Smith had no significant depression, but more significant anger (AR. 494). Baumgardner increased Smith's Effexor and told Smith to return in three months, absent problems (AR. 494).

On June 2, 2008, Baumgardner completed a Medical Source Statement (statement) on behalf of Smith (AR. 468-473). Baumgardner wrote that Smith had marked limitations in activities of daily living and in concentration, persistence, or pace (AR. 470). Baumgardner indicated Smith had moderate limitations in maintaining social functioning and experienced one or two episodes of decompensation (AR. 470). Baumgardner assigned a GAF score of 55[5] (AR. 468). Baumgardner indicated Smith's highest GAF in the past year was 60 (AR. 468). Baumgardner checked boxes indicating Smith had poor or no mental abilities in areas such as getting along with others, being aware of hazards, and carrying out simple instructions (AR. 472-473). Baumgardner gave the opinion Smith has moderate control of her disorder with medication (AR. 469). Baumgardner wrote he treated Smith from October 4, 2005, until February 26, 2008 (AR. 468), even though he had seen her as recently as May 13, 2008, pursuant to the treatment notes (AR. 493-494).

---

[5] A GAF of 51 through 60 is characterized by moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). **See** DSM-IV-TR at 34.

On June 5, 2008, Mark D. Nelson (Nelson)[6] completed a statement stating he had treated Smith since January 11, 2006 (AR. 474-479).  Nelson wrote that Smith suffered from bipolar disorder, type II, and had a current (and highest) GAF score of 50 (AR. 474). Nelson noted Smith suffered from extreme limitations in her activities of daily living, marked limitations with social functioning, concentration, persistence, and pace, and Smith suffered from three episodes of decompensation (AR. 476).  Nelson described Smith's symptoms as including hostility, poor memory, inappropriate affect, social withdrawal, decreased energy, and mood disturbance (AR. 474-475).  Nelson checked boxes indicating Smith had poor or no mental abilities in areas such as getting along with others, and carrying out simple instructions (AR. 478-479).  Nelson wrote Smith has very restricted activities due to her unsteady gait and slurred speech (AR. 476).  Nelson gave the opinion Smith had attained marginal or moderate control of her disorder with medication (AR. 475).

## THE ALJ'S DECISION

The ALJ concluded Smith was not disabled under the Act from April 1, 2004, through the date of the decision (AR. 13).  Accordingly, the ALJ determined Smith was not entitled to any disability benefits or SSI (AR. 19).  The ALJ framed the issues as: 1) whether Smith was disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Act and 2) whether Smith met the insured status requirements of sections 216(i) and 223 of the Act (AR. 13).  In regard to the second issue, the ALJ found Smith remained insured through June 30, 2009, and must establish disability on or before that date to be entitled to a period of disability and disability insurance benefits (AR. 13).

As noted by the ALJ, the Act defines "disability" as an inability to engage in any substantial gainful activity due to any medically determinable physical or mental impairment or combination of impairments (AR. 13).  **See** 42 U.S.C. § 423(d)(1)(A) (2004); 20 C.F.R. § 404.1505(a).  These impairments must be expected to result in death or must last for a continuous period of at least 12 months.  *Id.*  The ALJ must evaluate a disability claim

---

[6] Nelson did not include any professional degree or title on his statement (AR. 479).  The ALJ also recognized this lack of information (AR. 17).

according to the sequential five-step analysis prescribed by the Social Security regulations.
*Flynn v. Astrue*, 513 F.3d 788, 792 (8th Cir. 2008); 20 C.F.R. § 404.1520(a)(4).

> During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citation omitted).  More specifically, the ALJ examines:

> [A]ny current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and age, education and work experience.  **See** 20 C.F.R. § 404.1520(a); *Braswell v. Heckler*, 733 F.2d 531, 533 (8th Cir. 1984).  If the claimant suffers from an impairment that is included in the listing of presumptively disabling impairments (the Listings), or suffers from an impairment equal to such listed impairment, the claimant will be determined disabled without considering age, education, or work experience.  **See** *Braswell*, 733 F.2d at 533.  If the Commissioner finds that the claimant does not meet the Listings but is nevertheless unable to perform his or her past work, the burden of proof shifts to the Commissioner to prove, first, that the claimant retains the residual functional capacity to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy.  **See** *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).  A claimant's residual functional capacity is a medical question.  **See** *id.* at 858.

*Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000).  "If a claimant fails to meet the criteria at any step in the evaluation of a disability, the process ends and the claimant is determined to be not disabled."  *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citation omitted); **see** 20 C.F.R. § 404.1520(a)(4).

In this case, the ALJ followed the appropriate five-step sequential analysis.  The ALJ reviewed the record and found that Smith had not engaged in substantial gainful activity since April 1, 2004, the alleged onset date (AR. 15).  Under the second step, the ALJ found Smith had the following severe impairments:  osteoarthritis of the knees, bilateral knee joint replacement surgery, and after August 2005, episodic syncope (AR. 15).  By contrast, the

ALJ determined Smith's depressive disorder is controlled by medications and does not have a significant effect on Smith's ability to work (AR. 15). The ALJ determined the depressive disorder causes Smith mild restriction in the activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, and pace (AR. 15). However, the ALJ noted the depressive disorder has not caused extended episodes of decompensation (AR. 15). Therefore, the ALJ determined Smith's depressive disorder is "non-severe" (AR. 15) (**citing** 20 C.F.R. § 404.1520a(d)(1) and 20 C.F.R. § 416.920a(d)(1).

At step three, the ALJ determined Smith did not have an impairment or combination of impairments that meets or medically equals one of the impairments described in the Listings of Impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525, 404.1526, 404.1520(d), 416.920(d), 416.925 and 416.926) (AR. 16). The ALJ found Smith's knee surgeries did not result in residual marked deformity of the joints and Smith is able to ambulate effectively (AR. 16).[7] Before continuing to the fourth step of the ALJ's analysis, the ALJ determined Smith's residual functioning capacity (RFC) (AR. 16). The ALJ stated after careful consideration of the entire record, Smith has the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) (AR. 16). The ALJ found Smith is able to lift and carry ten pounds occasionally and up to ten pounds frequently (AR. 16). Further, the ALJ found Smith can stand or walk for two hours and sit for six hours in an eight-hour day, Smith is able to crouch, balance, stoop, and climb ramps and stairs (AR. 16). However, the ALJ found Smith is unable to kneel or crawl and must avoid extreme cold, unprotected heights, and dangerous machinery (AR. 16).

The ALJ's decision on disability is based on the record in its entirety (AR. 16). The ALJ cited evidence in the record about Smith's physical impairments indicating Smith's knee replacements are in excellent condition with no abnormalities (AR. 16). The ALJ stated that Smith's August 2005 fainting episode was triggered by seeing a fishhook piercing her grandchild's finger (AR. 16). The ALJ noted the CT scan and cardiac work-up showed no abnormalities (AR. 16). The ALJ stated that after November 2007, there is no evidence of treatment for seizures (AR. 16).

---

[7] Smith did not challenge these findings.

In regard to Smith's mental symptoms, the ALJ stated Smith's depressive symptoms were controlled by Zoloft in December 2004 (AR. 16).   The ALJ recognized this assessment was made during a general review of Smith's health for her knee surgery (AR. 16).   The ALJ determined Smith was diagnosed with bipolar disorder, but was on medication (AR. 16).   The ALJ noted Smith reported a lessening of symptoms and attended Goodwill in January 2006 (AR. 16).   The ALJ recognized Smith continued to received medication and counseling, but experienced fluctuating moods and overwhelming family situations (AR. 16).   In 2007, Smith received an excuse from employment without a formal description of limitations (AR. 16).   The ALJ noted that at the same time, Smith was urged to attend Goodwill services, but declined due to daily childcare responsibilities (AR. 16-17).

The ALJ recognized and reviewed the medical evidence and treatment records provided by Baumgardner and Nelson (AR. 16-17).   The ALJ stated the medical and opinion evidence was evaluated in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927 and Social Security Rulings (SSR) 96-2p, 96-5p, 96-6p, and 06-3p (AR 17).   The ALJ gave substantial weight to the opinion of the state agency analyst and reviewing medical consultant about Smith's physical limitations (AR. 17).   The ALJ stated those opinions were consistent with Smith's treating records (AR. 17).   The ALJ also gave substantial weight to the state agency conclusion that Smith's mental health impairment was non-severe, despite noting the opinion was reached before Smith began mental health treatment (AR. 17).   The ALJ stated little weight was given to Baumgardner and Nelson's June 2008 assessments due to their incongruity with actual treatment notes (AR. 17).   The ALJ stated the exaggerated limitations in the assessments suggest they were given as an accommodation to Smith rather than an accurate description of Smith's actual mental state (AR. 17).   The ALJ specifically noted Baumgardner estimated Smith's GAF score was 55-60, which is inconsistent with a marked limitation (AR. 17).   In any event, the ALJ noted a physician assistant is not an acceptable medical source under the Act (AR. 17).

The ALJ stated Smith's testimony about her symptoms and limitations was considered to the extent her testimony was consistent with the objective medical and other evidence (AR. 17).   The ALJ used a two-step process in considering Smith's described symptoms (AR. 17).   First, the ALJ determined whether an underlying medically

14

determinable physical or mental impairment could reasonably produce Smith's reported symptoms (AR. 17).  Second, in light of any impairment shown, the ALJ evaluated the intensity, persistence, and limiting effects of the alleged symptoms (AR. 17).

Based on the record evidence, the ALJ found Smith's medically determinable impairments could reasonably be expected to produce some of her alleged symptoms (AR. 18). However, the ALJ found Smith's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible (AR. 18).  The ALJ found Smith does not take prescription medication for knee pain, suggesting Smith's allegation of chronic severe pain are exaggerated (AR. 18).  The ALJ noted there have been no documented instances of syncope after October 2007 (AR. 18).  The ALJ also stated that although Smith testified to a limited range of daily activities, Smith was able to attend vocational training and regularly watch her grandchildren after the claimed onset of her disability (AR. 18).

Accordingly, the ALJ determined the objective medical evidence supports the conclusion that Smith's physical and mental limitations are not as severe as alleged (AR. 18).  Based on this determination, Smith's RFC, and the VE's testimony, the ALJ concluded Smith is capable of performing her past relevant work as a clerk (AR. 18).  Thus, the ALJ determined Smith is not disabled as defined in the Act (AR. 18-19).  Smith appeals these findings arguing:  (1) the ALJ erred by failing to find Smith's bipolar disorder was a severe impairment and (2) the ALJ erred by relying on an improper hypothetical question when examining the VE.  **See** Filing No. 17 - Brief p. 11.  The court will address each issue below.

## STANDARD OF REVIEW

A district court is given jurisdiction to review a decision to deny disability benefits according to 42 U.S.C. § 405(g).  The court must affirm the Commissioner's decision if "supported by substantial evidence on the record as a whole." ***Clevenger v. Soc. Sec. Admin.*, 567 F.3d 971, 974 (8th Cir. 2009)**.  "[I]t is the court's duty to review the disability benefit decision to determine if it is based on legal error." ***Nettles v. Schweiker*, 714 F.2d 833, 835-36 (8th Cir. 1983)**.  Questions of law are reviewed *de novo*.  **See *Olson v. Apfel*, 170 F.3d 820, 822 (8th Cir. 1999)**.  Findings of fact, by the ALJ, are "considered conclusive

if supported by substantial evidence on the record as a whole." **See** *Nettles*, 714 F.2d at 835. Furthermore, the court defers "to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007).

"Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010) (**quoting** *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)); **see also** *Burress v. Apfel*, 141 F.3d 875, 878 (8th Cir. 1998) (noting "substantial evidence in the record as a whole" standard is more rigorous than the "substantial evidence" standard).  "In reviewing the record, the court must consider both evidence that supports and evidence that detracts from the Commissioner's decision." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (internal quotations and citation omitted).  The reviewing court "will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently." *Wildman*, 596 F.3d at 964.

## DISCUSSION

**A.    The ALJ's Consideration of Medical Evidence**

Smith argues the ALJ committed an error of law by failing to find Smith's bipolar disorder is a severe impairment under the Social Security rulings and regulations.  **See** Filing No. 17 - Brief p. 11.  Specifically, Smith argues the ALJ gave substantial weight to the state agency analyst Dr. Schmechel's conclusion that Smith's impairment was non-severe even though the conclusion was reached before Smith began mental health treatment.  *Id.* at 15.  Smith argues the evidence shows that her condition significantly limits her ability to do basic work activity.  *Id.* at 18-23.

"It is the claimant's burden to establish that his impairment or combination of impairments are severe." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).  Although the requirement of severity is not an "onerous requirement," neither is it a "toothless standard." *Id.* at 708.  An "impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do

basic work activities." ***Kirby***, 500 F.3d at 708 (citing ***Bowen v. Yuckert***, 482 U.S. 137, 153 (1987)) (noting "the impairment would have no more than a minimal effect on the claimant's ability to work"); **see** 20 C.F.R. § 404.1521(a).   When considering the severity of mental impairments, the ALJ should consider four functional areas:  "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3).   When the degree of limitation in the first three functional areas are rated as "none" or "mild" and "none" in the fourth area, the Commissioner will generally conclude the impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the ability to do basic work activities.  20 C.F.R. § 404.1520a(d)(1).

"Impairments that are controllable or amenable to treatment do not support a finding of disability." ***Davidson v. Astrue***, 578 F.3d 838, 846 (8th Cir. 2009) (**citing ***Kisling v. Chater***, 105 F.3d 1255, 1257 (8th Cir. 1997)).  The same is true even where the symptoms may sometimes worsen, requiring adjustments in medication as long as the impairment is generally controllable. ***Davidson***, 578 F.3d at 846.  Further, the ALJ has a duty to fully and fairly develop a record; however, the ALJ does not have to discuss every piece of evidence presented. ***Wildman***, 596 F.3d at 966.   "Moreover, [a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." ***Id.*** (alteration in original) (**quoting ***Black v. Apfel***, 143 F.3d 383, 386 (8th Cir. 1998)).

The SSA recognizes two types of sources for evidence that may be used as evidence of an impairment or the severity of an impairment:  "acceptable medical sources" and "other sources." **See** 20 C.F.R. § 404.1513.  Therapists and physician's assistants are listed under "other sources" and are not considered "acceptable medical sources." 20 C.F.R. § 404.1513(d)(1); **see also ***Raney v. Barnhart***, 396 F.3d 1007, 1010 (8th Cir. 2005).  An "other source" opinion may by used to show the severity of an impairment, but may not be used to establish an impairment. **See** 20 C.F.R. § 404.1513.  An acceptable medical source that is also a treating source may be entitled to controlling weight. **See** SSR 06-3p.  However, "[i]n determining what weight to give 'other medical evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record." ***Raney***, 396 F.3d at 1010 (**citing** 20 C.F.R. § 416.927(d)(4)).   An ALJ may

discount a treating source's opinion if such opinion is inconsistent with the source's clinical treatment notes. *Davidson*, 578 F.3d at 843. A treating source's statement that a claimant is "disabled" or "unable to work," does not carry "any special significance," for the Commissioner who makes the ultimate determination of disability. *Davidson*, 578 F.3d at 842 (**citing** 20 C.F.R. § 416.927(e)(1), (3)).

Substantial evidence in the record support the ALJ's conclusion that Smith's bipolar disorder is not a severe impairment under the Act. The ALJ noted Smith's depressive symptoms were controlled by Zoloft (AR. 16). In February and December 2004, Smith's general health treatment notes indicate her depression was controlled by Zoloft (AR. 257, 265). In December 2005, Smith was pleasant, cooperative, logical, and goal-directed, had only minor breakthrough symptoms of anger and sadness and was taking her medication as prescribed (AR. 314). In January 2006, Smith stated she had "very mild depression" and was "very stable" (AR. 312). Smith also stated the medication was "working well," she "had no major concerns," and she had no angry outbursts, mood instability, or feelings of hopelessness (AR. 310, 312). Baumgardner assessed that Smith was stable and improved on medication (AR. 310, 312). Similarly, in February 2006, Baumgardner found Smith improved on the medication and only mildly restricted (AR. 304). In October and November 2006, Smith was described as pleasant, cooperative and only mildly restricted (AR. 288, 292). Smith reported "less problems with depression," but felt dizziness, which Baumgardner attributed as possibly a side effect of Cymbalta (AR. 288, 292).

In January 2007, Smith reported increased agitation and irritability, but had been out of her medications for two weeks (AR. 286). In June 2007, Baumgardner determined Smith had issues with increased depression, but was not taking medication as directed (AR. 280-281). In July 2007, Baumgardner again questioned whether Smith was taking medication as directed and noted Smith was malodorous and her ADL's could improve, but encouraged her to visit Goodwill despite her childcare responsibilities (AR. 278-279). Baumgardner scheduled Smith for injections of her medication, but Smith missed an appointment, and her condition worsened as indicated by poor ADL's (AR. 279, 274).

In February 2008, Smith reported improvement on her new medication, better mobility, increased energy, and a "desire to do things, getting more done around the house" (AR. 269). Smith also reported her children and grandchildren moved out and

Smith's friends and daughter would often pick Smith up and take her out (AR. 269). Baumgardner and Nelson both gave the opinion, in their June 2008 statements, that Smith has moderate control of her disorder with medication (AR. 469, 475).

Further the ALJ gave substantial weight to the state agency conclusion that Smith's depressive disorder was non-severe (AR. 17). Acknowledging the state agency conclusion was reached before Smith began regular mental health treatment, the ALJ gave substantial weight to the state agency conclusion due to the opinion's consistency with Smith's treatment notes (AR. 17). Additionally, Baumgardner's and Nelson's opinions are not entitled to controlling weight. As a physician's assistant and a therapist, neither Baumgardner nor Nelson are considered to be an "acceptable medical source." **See** 20 C.F.R 404.1527; 20 C.F.R. § 404.1513(a)-(d). The ALJ need not accord Baumgardner or Nelson's opinions with substantial weight if the opinions are not well-supported or are inconsistent with other substantial evidence in the record. The ALJ specifically noted apparent exaggerations and inconsistencies within the opinions and as compared to treatment notes. For example, although Baumgardner's initial GAF score and Nelson's GAF scores indicated Smith had a serious impairment, the ALJ noted these "assessments are incongruous with [Baumgardner and Nelson's] actual treatment notes" (AR. 17). More importantly, as the ALJ noted, Baumgardner assessed Smith with a GAF score of 55-60, which indicated only moderate symptoms (AR. 17). Despite the fact that there may be evidence in the record to support Smith's argument, "[w]hether the record supports a contrary result . . . is immaterial." *Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005).

The evidence of record, as stated above, supports the ALJ's finding that Smith's bipolar disorder was not severe because it was controllable with medication. Although there is some evidence to support a contrary conclusion, the ALJ's conclusion is supported by substantial evidence in the record as a whole and was not made in error. Throughout the record, treatment notes indicate Smith's bipolar disorder was regulated by medication and her limitations were not as severe as Baumgardner and Nelson stated or as Smith testified to at the hearing. Baumgardner's opinion about Smith's ability to work was unsubstantiated and unsupported. Therefore, the ALJ did not err in concluding Smith had no more than mild limitations in activities of daily living, in maintaining social functioning, and in maintaining concentration. Finally, contrary to Baumgardner and Nelson's

19

statements about the number of episodes of decompensation Smith suffered, the record shows none. Under these circumstances, where the degree of Smith's limitation in the first three functional areas was "none" or "mild" and "none" in the fourth area, a finding the impairment is not severe is generally appropriate. In this case the evidence in the record does not otherwise indicate there is more than a minimal limitation in Smith's ability to do basic work activities. Accordingly, the court finds no error in the ALJ's finding Smith's bipolar disorder was not a severe impairment under the Social Security regulations and rulings.

**B.     Hypothetical Questions Posed to Vocational Expert**

Smith argues the ALJ committed an error by relying on the VE's answer to an improper hypothetical question. **See** Filing No. 17 - Brief p. 23. Specifically, Smith argues the ALJ improperly failed to include Smith's mental limitations in the question posed to the VE. **Id.** Smith argues because the ALJ did not include Smith's mental limitations in the ALJ's hypothetical question, the hypothetical question does not provide substantial evidence to support the ALJ's conclusion of no disability. **Id.** at 25.

"In fashioning an appropriate hypothetical question for a vocational expert, the ALJ is required to include all the claimant's impairments supported by substantial evidence in the record as a whole." **Swope v. Barnhart**, 436 F.3d 1023, 1025 (8th Cir. 2006). However, hypothetical questions posed to a VE are proper if they sufficiently set out all of the impairments accepted by the ALJ as true, and if the questions likewise exclude impairments that the ALJ has reasonably discredited. **Pearsall v. Massanari**, 274 F.3d 1211, 1220 (8th Cir. 2001); **see Gragg v. Astrue**, No. 09-3238, 2010 WL 3075713, at *8 (8th Cir. Aug. 9, 2010). An ALJ may exclude from the hypothetical question posed to the VE "any alleged impairments that [the ALJ] has properly rejected as untrue or unsubstantiated." **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001). "Likewise, we have held that an ALJ may omit alleged impairments from a hypothetical question when the record does not support the claimant's contention that [the] impairments significantly restricted [the] ability to perform gainful employment." **Owen v. Astrue**, 551 F.3d 792, 801-02 (8th Cir. 2008).

The ALJ's hypothetical question properly included Smith's credible limitations. Although Smith argues the ALJ failed to include Smith's bipolar disorder as a severe limitation, as discussed above, the ALJ permissibly determined Smith's bipolar disorder was non-severe.  See **_Finch v. Astrue_**, 547 F.3d 933, 937 (8th Cir. 2008) (finding ALJ was not required to present claimant's limited mental capacity to VE because the mental impairments did not restrict his daily activities, social functioning, or concentration); **compare _Swope v. Barnhart_**, 436 F.3d 1023, 1025 (8th Cir. 2006) (finding error for ALJ to exclude IQ test results indicating borderline intellectual functioning in the hypothetical posed to the vocational expert).  The hypothetical posed to the VE in this case included the impairments that the ALJ found to be substantially supported by the record as a whole. Therefore, the VE's testimony constitutes substantial evidence which supports the ALJ's determination that Smith was not disabled.

## CONCLUSION

For the reasons stated above, the court concludes the ALJ's decision, which represents the final decision of the Commissioner of the SSA, should not be reversed or remanded.  The ALJ's decision does not contain the errors alleged by Smith.  Specifically, substantial evidence in the record supports the ALJ's decision that Smith did not have a severe mental impairment and subsequent hypothetical question.  Substantial evidence in the record as a whole supports the ALJ's denial of benefits.  Accordingly, the Commissioner's decision is affirmed.

**IT IS ORDERED:**

The decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the defendant will be entered in a separate document.

DATED this 7th day of September, 2010.

BY THE COURT:
 s/ Thomas D. Thalken
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.